IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ABRAHAMAN MUHAMMAD and
KAISHAUN VALENTINO ROSS,

          Defendant.

CRIMINAL CASE NO.
1:11-CR-488-01-ODE-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

Pending before this Court are Defendant Abrahaman Muhammad's Motion to Suppress Evidence (Docket Entry 26), Motion to Suppress Statements (Docket Entry 27), and Motion to Adopt Defendant Kaishaun Ross' Motion to Suppress the Results of the Search of the Jeep Compass Conducted on October 23, 2010 (Docket Entry 30). Defendant Kaishaun Ross' Motion to Suppress the Search of the Jeep Compass Conducted on October 23, 2010 (Docket Entry 25) and Motion to Sever Parties (Docket Entry 31) are also before the Court. This Court convened suppression hearings with respect to the Defendants' suppression motions on March 8, 2012, and April 10, 2012. Docket Entries [39, 40]. After the suppression hearing, the Defendants submitted post-

hearing briefs in support of their motions. Docket Entries [46, 48]. Having considered the Defendants' motions, the parties' briefs, and all supporting documents submitted, and for the reasons set forth below, this Court **ORDERS AND RECOMMENDS** as follows:

(1)    Defendant Muhammad's Motion to Suppress Evidence should be **GRANTED IN PART**. Docket Entry [26].

(2)    Defendant Muhammad's Motion to Suppress Statements is **DEEMED WITHDRAWN.** Docket Entry [27].

(3)    Defendant Muhammad's Motion to Adopt Defendant Kaishaun Ross' Motion to Suppress the Results of the Search of the Jeep Compass Conducted on October 23, 2010, is **GRANTED**. Docket Entry [30].

(4)    Defendants' Motion to Suppress the Search of the Jeep Compass Conducted on October 23, 2010, should be **DENIED**. Docket Entry [25].

(5)    Defendant Ross's Motion to Sever Parties is **DEFERRED TO THE DISTRICT COURT**. Docket Entry [31].

<u>**DEFENDANT MUHAMMAD'S MOTION TO ADOPT**</u>
<u>**DEFENDANT ROSS'S MOTION TO SUPPRESS**</u>

In Defendant Abrahaman Muhammad's Motion to Adopt, Muhammad seeks to

2

adopt Defendant Kaishaun Ross's Motion to Suppress the Results of the Search of the Jeep Compass Conducted on October 23, 2010. Defendant Muhammad's Motion to Adopt is **GRANTED**. Docket Entry [30].

<u>**DEFENDANT MUHAMMAD'S MOTION TO SUPPRESS STATEMENTS**</u>

Because Defendant Muhammad withdrew his Motion to Suppress Statements in his Post-Hearing Brief (Docket Entry [48], p. 1), the Motion to Suppress Statements is **DEEMED WITHDRAWN**. Docket Entry [27].

<u>**DEFENDANT MUHAMMAD'S MOTION TO SUPPRESS EVIDENCE**</u>

## I.   <u>BACKGROUND</u>

On October 25, 2011, the grand jury returned an eighteen-count indictment against Defendants Abrahaman Muhammad and Kaishaun Ross ("Defendants"), including one count of conspiracy to make false statements to a federally licensed firearms dealer with respect to records of the firearms dealer in violation of 18 U.S.C. § 924(a)(1)(A) against Muhammad and Ross, and two counts for aiding and abetting each other by causing false representations to be made concerning information required to be kept in the records of a federal firearms licensee in violation of 18 U.S.C. §§ 2, 924(a)(1)(A) against Muhammad and Ross. Defendant Muhammad ("Muhammad") is also charged with fourteen counts of causing false representations to be made with

respect to information required to be kept in the records of a federal firearms licensee in violation of 18 U.S.C. § 924(a)(1)(A), and one count of engaging in the business of dealing in firearms without being a federally licensed dealer, in violation of 18 U.S.C. § 922(a)(1)(A).

### A.    Events of December 23, 2010

#### 1.    ATF Agents Conduct Surveillance of Defendants Muhammad and Ross

On December 23, 2010, Agent Benjamin Southall, who has served the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") for twenty-one years and investigates violations of federal firearms laws, and Special Agent Michael Roland, who has served with the ATF since June 2001 and primarily investigates firearm violations, conducted surveillance on Defendant Muhammad.  (Tr. 87-91, 305-08).  The agents received a tip from a pawn shop dealer that Muhammad purchased a number of firearms from the pawn shop. (Tr. 91-92).  Agent Southall observed Muhammad leave the pawn shop with the firearms and enter a car with Defendant Kaishaun Ross ("Ross").  (Tr. 93). The agents observed the car proceeding to the airport.  (Tr. 96).

The agents continued their observation inside the airport and at some point, contacted two Air Marshals for assistance because they were on their territory and they

were concerned that Muhammad's bag, perhaps containing the firearms, would make it past security on the main level of the airport and on to a lower level distribution area to be sent down to the airplane, without being inspected. (Tr. 98-99, 100-02, 162-63). Agent Southall explained that the agents were conducting surveillance on Muhammad and that they were unsure whether Muhammad was there to drop off a bag or check a bag and get on a flight. (Tr. 244-45, 255). A supervisor asked Michael Barber, who has served as a federal Air Marshal for ten years, to help Agent Southall familiarize himself with the airport. (Tr. 244-46, 255). Air Marshal Barber also works for the Transportation Security Administration ("TSA") and is responsible for ensuring compliance with regulations that the TSA enforces. (Tr. 244-45, 255). Air Marshal Barber met with Agent Southall and showed him the manner in which a bag may proceed through the airport if it was checked. (Tr. 246).

### 2.    Muhammad Declares that he has a Weapon in his bag, but his bag Clears the Airline Ticketing Counter Without Inspection

After several hours, Agent Southall observed Muhammad obtain a ticket from the Spirit Airlines ticket counter, walk towards the oversized baggage area, check his baggage, and walk away. (Tr. 98-99, 162, 284). Agent Southall testified that he talked with a supervisor, Robert McGowan, from Spirit Airlines to see if a Spirit Airlines

5

representative had looked in Muhammad's bag to make sure any firearms were unloaded, but learned that no one from Spirit Airlines had done so. (Tr. 100, 103-04, 156, 162). McGowan took the position that it is the TSA's job to inspect the weapon. (Tr. 103-04, 156, 162). Agent Southall told McGowan that he could not believe that the airline employees did not look at the guns to make sure they were unloaded. (Tr. 164). McGowan responded that there had been an incident involving an accidental discharge of a weapon. (Tr. 164). Special Agent Roland similarly testified that they were "in absolute[] awe" that a civilian could have a gun in his or her luggage and not face a thorough inspection. (Tr. 330). Agent Southall admits, however, that one could look at the gun until he or she is "blue in the face," but would not be able to tell if the gun is loaded or not. (Tr. 165).

Agent Southall believes that the person who waited on Muhammad at the Spirit Airlines ticket counter was Regina Kelley. (Tr. 156). Kelley testified that she is familiar with the procedures for processing passengers who declare firearms, that weapons and ammunition have to be separated, and that a weapon has to be in a hard-shell container. (Tr. 178-79). According to Kelley, when a passenger advises her that he or she is traveling with a firearm, she requires them to complete a declaration form. (Tr. 178). Kelley testified that she always requires the passenger to open his or her bag to show her

6

the firearm, but she never touches the firearm or checks to see if the firearm is loaded or unloaded.  (Tr. 178-79, 181, 187).  Kelley states that she just asks the passenger whether the firearm is unloaded.  (Tr. 179, 187).

While Kelley handled customers who travel with firearms, on average, twice a week, there was only one occasion in which Kelley recalls law enforcement officers being involved. (Tr. 179-80).  Although Kelley does not remember the names of the law enforcement officers who approached her, Kelley remembers that between 4:00 p.m. and 5:30 p.m. on the day in question, her supervisor told her that a male passenger would be coming in and checking a firearm and that she was to check him in the regular manner. (Tr. 183-85, 187).  About five minutes later, Kelley waited on a passenger who declared a firearm.  (Tr. 181, 186).  Kelley claims that the passenger opened his case and she visually inspected the firearm.  (Tr. 181, 186).

In contrast, Air Marshal Barber credibly testified that he observed Muhammad interact with the ticket agent and that the ticket agent merely accepted paperwork completed by Muhammad, but did not open Muhammad's bag. (Tr. 249-50). According to Air Marshal Barber, however, this was not improper.  (Tr. 287).  Air Marshal Barber testified that the passenger has a duty to state that he or she is carrying a weapon in the bag, and the airline has the responsibility to complete paperwork and have a declaration

7

sent to the TSA for screening. (Tr. 288). At that point, the inspection of the bag is the TSA screening officer's obligation. (Tr. 288).

Consistent with Air Marshal Barber's understanding, Elizabeth Shockley, who has served as the Assistant Federal Security Director for Inspections with the TSA for ten years, testified that the individual airlines are prohibited from inspecting a gun to determine whether it is loaded or unloaded. (Tr. 192, 199). Instead, the airline requires that a passenger complete a declaration form indicating that the firearm is unloaded, packed in a hard-sided, locked container, and that only the passenger has control of the lock. (Tr. 199-200). The airline takes the passenger's declaration at face value. (Tr. 200). The luggage is then tendered to the airline, but sent to the TSA for screening. (Tr. 195). The TSA has the authority to check the case to determine whether it is locked and to ensure compliance with regulations. (Tr. 197).

### 3. After Muhammad's Bag Clears Inspection by the TSA Oversized bag Counter, Agent Southall Suggests to Air Marshal Barber that he Open the Bag to Ensure the Guns Were Unloaded and Properly Packaged

Agent Southall, other agents, and Air Marshal Barber went to the oversized baggage counter, which is run by the TSA, but did not approach Muhammad because they did not want him to know that they were following him. (Tr. 100). Once

8

Muhammad and his bag arrived at the oversized baggage counter, the TSA agent there swabbed the bag for explosives but did not check inside the bag. (Tr. 104, 251, 289). Afterwards, the TSA agents simply leaned Muhammad's bag against the wall, presumably for transport to the aircraft. (Tr. 105).

Because no one had looked in Muhammad's bag to make sure the firearms were unloaded, Agent Southall suggested to Air Marshal Barber that he look in the baggage to make sure the guns were packaged properly, were unloaded, and were being properly transported. (Tr. 103, 105, 243). Agent Southall was visibly upset at the time over the TSA's failure to look in Muhammad's bag because usually when he travels with declared guns, the TSA agent opens his bag, takes everything out, and searches through the bag. (Tr. 108, 159, 300). Nevertheless, both Agent Southall and Air Marshal Barber agree that Agent Southall did not order or demand anyone to go into Muhammad's bag. (Tr. 108, 260).

Air Marshal Barber testified that he asked the TSA agent at the oversized baggage counter whether he was going to do an inspection of the declared weapon, and the TSA agent indicated that he was not going to do so. Air Marshal Barber was concerned that because there had not been a visual inspection of the weapon, the manner in which the weapon was packed might not comply with federal regulations. (Tr. 252-54). Air

9

Marshal Barber also testified that he wanted to make sure that the gun was packed in a locked, hard-sided case, the gun was unloaded, and any ammunition was separated from the gun. (Tr. 252). According to Air Marshal Barber, this was the first time he ever observed that there was no inspection to make sure that a firearm was unloaded. (Tr. 253).

Air Marshal Barber also testified that because he was unsure whether the TSA has an obligation to check inside luggage once a weapon is declared, he asked for the assistance of a supervisor. (Tr. 252-54, 289-90). According to Air Marshal Barber, a male supervisor appeared within a couple of minutes. (Tr. 254, 290). Air Marshal Barber explained to the TSA supervisor that he was concerned that there were weapons inside the bag that were not screened according to federal regulation requirements and explained that he would like to look inside the bag. (Tr. 105, 254-55). The supervisor agreed to allow Air Marshal Barber to open the luggage. (Tr. 256). For the first time during his tenure as a federal Air Marshal, Barber inspected the luggage at the oversized baggage counter. (Tr. 252). Prior to the search of Muhammad's bag, Air Marshal Barber's searches of luggage containing weapons had always been conducted in the secured room in the lower level of the building. (Tr. 293-94, 303).

Although Air Marshal Barber is not a screener, his job duties include making sure

10

that there is not a potential threat to safety or security. (Tr. 255). That means that from time to time Air Marshal Barber will be involved in looking through bags. (Tr. 255). Air Marshal Barber testified that he has inspected luggage in several areas of the airport in areas that were sometimes opened to the public such as the main security checkpoint and the international checkpoint's secondary screening area. (Tr. 303).

Additionally, if a bag goes to the screening room and a weapon is discovered, TSA inspectors will show up, determine if there is a weapon, and if there is, "there is an attempt made to see the weapon." (Tr. 255). If the weapon is in a locked case, if the lock is cut, or if the weapon is unsafe, a call is made to the airline to have the passenger return from the secured part of the airport to meet an officer to take care of the weapon. (Tr. 256).

### 4. Air Marshal Barber Removed and Viewed the Contents of a Hard Shell Case Inside Muhammad's Bag

A TSA Security Officer opened Muhammad's bag. (Tr. 256, 221). Once the bag was opened, Agent Southall observed one fifteen by ten by four or five inches tall, hard-side case. (Tr. 105). Although the case had a combination lock, the TSA agent was able to open the hard-side case by entering a default combination. (Tr. 106, 221, 257-58). Agent Southall observed Agent Barber remove one firearm, tattoo equipment below the

11

firearm, and between six to ten more firearms below the tattoo equipment, although Muhammad had only declared one firearm. (Tr. 103, 106-07, 258). Air Marshal Barber states that he was removing the firearms to ensure that they were not loaded because a loaded weapon could accidentally discharge if baggage handlers handled the luggage roughly, or, with more catastrophic effects, if the firearm was jostled on the aircraft. (Tr. 258). After inspecting the case and learning that the firearms were unloaded, Air Marshal Barber repacked the guns into the case, put the tattoo equipment on top and put the top firearm back in, left a white note stating that the bag was inspected, and sent the luggage to be boarded onto the plane.[1] (Tr. 115, 225-26). Air Marshal Barber stated that he thought that his inspection lasted no longer than five minutes. (Tr. 264).

Agent Southall testified that as Air Marshal Barber removed the firearms, Barber read out the make, model, serial numbers to Agent Southall, who wrote them down.[2] (Tr. 107, 261). Another ATF agent took photographs during this time. (Tr. 107, 171, 261). The photographs have been submitted to the Court as Exhibits 4A-4N. The

---

[1] The TSA supervisor testified that he thought he put the note in the bag letting Muhammad know that the bag had been inspected. (Tr. 226).

[2] Air Marshal Barber testified that he did not read out the serial numbers, that instead, Southall was bent over the table reading and writing down the serial numbers. (Tr. 261).

12

pictures depict the guns at close range and the guns appear to be placed with their model numbers and serial numbers face up. (<u>Compare</u> Gov't's Ex. 4A-4N <u>with</u> Indictment). The ATF agents did not handle the guns. (Tr. 227).

Air Marshal Barber's inspection did not occur in the presence of Muhammad. (Tr. 264-65). No one attempted to call Muhammad prior to opening the bag. Agent Southall testified that he did not ask any TSA agent to contact Muhammad because he did not want Muhammad to know the agents were following him. (Tr. 111). A printout from the website hosted by the TSA, which explains to the public the rules pertaining to traveling with special items, provides that passengers transporting firearms, ammunition, or firearm parts must declare all firearms to the airline during the ticket counter check-in process, ensure that the firearms are unloaded and packed in a hard-sided container, and kept in their checked baggage. (Tr. 350; Def.'s Ex. 1). It further advises passengers of the following:

> We recommend that you provide the key or combination to the security officer if he or she needs to open the container. You should remain in the area designated by the aircraft operator or TSA representative to take the key back after the container is cleared for transportation. If you are not present and the security officer must open the container, we or the airline will make a reasonable attempt to contact you. If we can't contact you, the container will not be placed on the plane. Federal regulations prohibit unlocked gun cases (or cases with broken locks) on aircraft. . . .

13

(Def.'s Ex. 1, Tr. 350-51).

Iona Babtiste, who has been employed as a Security Manager with the TSA since 2002, confirmed that these were the TSA's procedures and that the majority of times passengers were present during searches of their luggage. (Tr. 353-55, 361-66). Normally, the passenger brings the luggage to the TSA agent to be searched and remains present at all times. (Tr. 353). If the passenger is not present and the TSA officer must open the container, the TSA lets airline representatives know so that they can try to get the passenger to return to the counter. (Tr. 354). This procedure is in place due to concerns about theft. (Tr. 362). According to Babtiste, if the passenger gets on the plane and does not return to the counter, the container is going to remain locked and stay with the TSA. (Tr. 355-56). Babtiste also confirms that the cards notifying the passenger that his or her luggage has been searched are placed in the luggage when the luggage is searched after it reaches the room on the lower level of the airport. (Tr. 353-55, 361-62). Babtiste agrees, however, that the passenger's presence for a search is a courtesy and that if a passenger is not present when a bag is searched, there is not necessarily a violation of protocol. (Tr. 363).

TSA Supervisor Harold Wurzbach, who was at the scene, testified that when the inspectors first open a bag belonging to a passenger carrying a gun, the passenger is

14

required to be there to answer questions. (Tr. 214, 226). Once the bag is cleared, the passenger can leave. (Tr. 226). TSA Supervisor Wurzbach stated that if they feel it necessary to further inspect a bag that has been turned over to them after the passenger has left, they can do so. (Tr. 227). Wurzbach claims that they are not required to contact the passenger if they can open the container on their own, and that if they do so, they leave a card in the suitcase indicating that the bag was inspected. (Tr. 232-33, 239).

### 5. Air Marshal Barber Records his Recollection of the Incident in a Memorandum

At Agent Southall's request, Air Marshal Barber wrote a memorandum memorializing the incident. (Tr. 262-63). In Air Marshal Barber's memo, Barber wrote that he asked TSA Manager Iona Babtiste for authority to inspect the bag. Air Marshal Barber's memorandum provided in part:

> Based on my observations of the weapon being declared by the subject, I concluded that the weapon was not visibly inspected by the Airline Ticket Agent for proper checked weapon transport. (A weapon checked for transport on a US airline must be secured in a hard side case and configured in a safe mode and separated from ammunition.). I met with TSA Manager Iona Babtiste and requested that I be authorized to inspect the weapon for proper transport and safety. Manager Babtiste agreed to my request. Upon opening the luggage and the proper hard sided case, I removed several weapons to insure they were safe. Agent Southall took photos and wrote down one serial number during my inspection. I concluded the weapons

15

> were properly stored. I repacked the luggage as found and allowed it to
> continue to the airplane (A TSA letter was placed in the luggage informing
> the subject that his bag was inspected.). No additional Federal Air
> Marshal/TSA involvement.

(Def.'s Ex. 2, Tr. 295). Air Marshal Barber later testified, however, that after obtaining

authorization to open the bag from the male supervisor, he asked for the manager. (Tr.

290). Air Marshal Barber testified that he felt he needed to talk to the manager because

there might be something he did not know that may prevent him from opening the bag.

(Tr. 291). Security Manager Babtiste responded. (Tr. 290). Air Marshal Barber

testified that he did not ask Babtiste for permission to open the case and just discussed

with her whether the inspection was proper as he was in the process of repacking the

bag. (Tr. 263-64, 296, 336). Air Marshal Barber testified that his indication to the

contrary in his memorandum was a mistake and that he confused the two managers when

he wrote the memorandum. (Tr. 296). According to Air Marshal Barber, he explained

his concerns about what he had observed, asked about the process, and asked Baptiste

whether she thought what he had done was proper. (Tr. 263, 291-92).

The TSA supervisor at the scene also testified that he was instructed to open the

bag before Babtiste arrived. (Tr. 221-23). The TSA supervisor further testified that this

was the first time in his nearly ten years of employment with the TSA that an Air

16

Marshal participated in the screening process.  (Tr. 229-30).

### 6. Security Manager Babtiste Also Memorializes the Incident in a Memorandum

Security Manager Babtiste confirms that Muhammad's luggage was already opened when she arrived on the scene and that firearms were on the table.  (Tr. 340, 343).  Babtiste wrote a memorandum memorializing the incident for herself.  (Tr. 341-42, Def.'s Ex. 3).  Babtiste's memorandum states in part:

> On Thursday around 17:42 pm On 12/22/10 I got call from STSO Tom at the North oversize opposite Spirit Airlines.  On arrival there were several DEA agents at the table wanting STO Tom to open a gun case and count how many gun ext.  They were told what TSA protocol was and Spirit Airlines TSM also told them Airlines protocol.  The DEA agent did not understand the protocols that was set in place.  When asked can they open the gun case ATSM Jerry Estes present also say go ahead do your job.  There was one agent that was very upset and demanding. . . .

(Def.'s Ex. 3).  Babtiste testified that the reason she wrote that the federal agents at the table wanted TSA Supervisor Wurzbach to open the gun case and count how many guns was because Wurzbach told her that was what had occurred.  (Tr. 345, Def.'s Ex. 3).  Baptiste contends she was writing information that was conveyed to her by Wurzbach as she remembered it.  (Tr. 357).  Babtiste also testified that the reason she came to the scene was because Agent Southall was frustrated by their protocols.  (Tr. 346-47).  According to Babtiste, when she arrived, there was "[l]ots of chaos.  Everybody talking,

17

you know, what they want us to do, and we were just neutral." (Tr. 370). Babtiste memorialized the incident in a memorandum because she was concerned that due to Agent Southall's frustration, the matter could escalate higher and she wanted to make sure that she remembered what to tell her supervisor. (Tr. 347-48). However, although Babtiste testified that the authorization to open the case was given before her arrival and that the guns were on the table when she arrived, she also testified that Jerry Estes, who is in her chain of command, arrived at the same time as she did and told "them to go ahead and do their job if they want to open whatever they want to open." (Tr. 348). Babtiste later testified that she was not present when Estes told any "DEA" agents to open the case. (Tr. 358).

## II.   **LEGAL ANALYSIS**

Muhammad argues evidence obtained during the search of his bag should be suppressed because the search of the bag was an unlawful, warrantless search. In support, Muhammad argues the search was not a valid administrative search because it was instigated by ATF Agent Southall. In support, Muhammad argues Agent Southall's instigation was the reason for the search because the airline representative had already examined the case and his checked bag had already cleared the TSA inspection at the oversized baggage counter. Muhammad also relies on Manager Babtiste's testimony

18

that the ATF agents present wanted to count the number of guns in the case and that Agent Southall was very upset and demanding. Muhammad argues that, at a minimum, the evidence in this case demonstrates that Air Marshal Barber and the TSA representatives had an unlawful secondary motive beyond determining that the guns were properly packed and unloaded because the bag had already cleared inspection by the airline counter agent and the TSA oversized bag counter, the TSA agent at the oversized bag counter testified that this was the only occasion in which a federal Air Marshal became involved in a search of baggage at his location in his ten years of employment, ATF agents actually observed and took part in the search, and ATF agents took photographs even though they were unnecessary for the TSA's purposes. Muhammad further argues the search was not a valid administrative search because the search was in derogation of the procedures outlined in the TSA's website requiring that TSA personnel contact him prior to the search, searches conducted by the TSA never include a physical inspection of the gun, and the TSA's own publications inform passengers that they are to wait in the inspection area pending examination.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is well settled under the Fourth and Fourteenth Amendments that

19

a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). One exception to the requirement that a warrant be obtained prior to a search applicable to airport screenings is administrative searches. See United States v. Hartwell, 436 F.3d 174, 177 (3d Cir. 2006), quoting United States v. Marquez, 410 F.3d 612, 616 (9th Cir. 2005) ("Airport screenings of passengers and their baggage constitute administrative searches and are subject to the limitations of the Fourth Amendment."); 5 Wayne R. LaFave, Search and Seizure § 10.6, p. 291 (4th ed. 2004) (noting that under the present day program where all passengers must pass through airport screening, the appropriate standards for evaluation are found in Supreme Court cases dealing with administrative searches). In such cases, blanket suspicionless searches may be constitutionally reasonable where they are calibrated to a risk. United States v. McCarty, 648 F.3d 820, 830-31 (9th Cir. 2011); United States v. Herzbrun, 723 F.2d 773, 775, 776 (11th Cir. 1984) (holding that in such cases, the reasonableness requirement under the Fourth Amendment requires that the courts weigh the necessity of the search, the possible harm to the public, the likelihood that the search procedure will be effective in averting the potential harm, and the degree and nature of intrusion). In general, airport screening searches of luggage are

20

constitutionally reasonable administrative searches because they are conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely to ensure the safety of passengers, baggage handlers, and airline and airport staff. McCarty, 648 F.3d at 830-31; Herzbrun, 723 F.2d at 775, 777 n.5.

Administrative searches such as airport screenings are still governed by the Fourth Amendment's reasonableness requirements. Bruce v. Beary, 498 F.3d 1232, 1249 (11th Cir. 2007). Under normal circumstances, Fourth Amendment reasonableness is predominantly an objective inquiry. Ashcroft v. al-Kidd, —U.S.—, 131 S. Ct. 2074, 2080-81 (2011). The court merely inquires whether the circumstances justified the challenged action. Id. If so, the action was reasonable whatever the subjective intent motivating the relevant officials. Id. at 2080. When examining the reasonableness of an administrative search, actual motivations do matter. Id. at 2081-82. This is so because of the concern that the administrative search exception could become a pretext for crime control. Bruce, 498 F.3d at 1241; Swint v. City of Wadley, 51 F.3d 988, 998 (11th Cir. 1995) ("While legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment, pretextual administrative searches do."). Therefore, the administrative search exception does not apply where the officer's purpose is not to attend to the investigation for which

21

the administrative inspection is justified. <u>al-Kidd</u>, 131 S. Ct. at 2081. That means the administrative search may not exceed its limited scope. <u>Bruce</u>, 498 F.3d at 1249; <u>Herzbrun</u>, 723 F.2d at 777 n.5, <u>quoting</u> <u>United States v. Bell</u>, 464 F.2d 667, 675 (2d Cir. 1972) ("When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger alone meets the test of reasonableness, *so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope* . . . .") (emphasis added). Accordingly, an airport search is "a valid administrative search only so long as the scope of the administrative search exception is not exceeded; 'once a search is conducted for a criminal investigatory purpose, it can no longer be justified under an administrative search rationale.'" <u>McCarty</u>, 648 F.3d at 831; <u>Herzbrun</u>, 723 F.2d at 777 n.5. Where the search is no more extensive nor intensive than necessary, in light of current technology, to achieve the lawful administrative purpose, that is in this case, ensuring that the weapons within the luggage were packaged in a way that did not put at risk the safety of baggage handlers and individuals aboard the aircraft, and was confined in good faith to that purpose, the search is constitutionally reasonable. <u>McCarty</u>, 648 F.3d at 831, <u>United States v. Rosales</u>, No. 10-339 (PJS/JJK), 2011 WL 6003941, at *5 (D. Minn. Oct. 28, 2011); <u>Vanbrocklen v. United States</u>, No. 08-CV-

22

272(M), 2011 WL 721638, at *2 (W.D.N.Y. Feb. 22, 2011); United States v. Fofana, 620 F. Supp. 2d 857, 862 (S.D. Ohio 2009); see also Bruce, 498 F.3d at 1248 ("To meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as it is consistent with the satisfaction of the administrative need that justifies it.").

Where the search is taken pursuant to a general scheme without individualized suspicion, consideration of the government's actual motivation has been limited to inquiring into the programmatic purposes motivating the search. McCarty, 648 F.3d at 832-33, citing al-Kidd, 131 S. Ct. at 2081. Where a warrantless search is conducted pursuant to a lawful administrative scheme and the motivation for the administrative scheme is a constitutionally permissible one, the subjective motive of the individual conducting the search will not invalidate the search. McCarty, 648 F.3d at 833. Thus, when an officer has an unlawful secondary purpose in mind when searching a bag, such as hoping to find contraband inside, the secondary purpose does not invalidate the otherwise lawful administrative search because the searching officer's actions would have been the same regardless of his true motivation. McCarty, 648 F.3d at 833. Such warrantless and suspicionless airport screening searches are constitutionally reasonable

23

administrative searches, despite any investigatory secondary motive, when (1) the search

was undertaken pursuant to a legitimate administrative search scheme; (2) the searcher's

actions are cabined to the scope of the permissible administrative search; and (3) there

was no impermissible programmatic secondary motive for the search.[3]  McCarty, 648

F.3d at 834-35.

### A.    There was No Impermissible Programmatic Secondary Motive for the Search

Clearly, there was no impermissible secondary *programmatic* motive for the

search.  Examination of the programmatic motive involves the motivation for the TSA

search scheme itself, not motivations of the individual employees of the TSA.  McCarty,

648 F.3d at 834.  The programmatic motive for searches by the TSA is to assess whether

cargo poses a threat to transportation security.  49 U.S.C. § 44901(g)(5); see also

McCarty, 648 F.3d at 834 ("The TSA search scheme under which she operated was

focused solely on the discovery of threats to air travel safety").  No evidence in this case

exists to show that the TSA's general search scheme is put into place for an

---

[3]  This case is a matter of first impression in the Eleventh Circuit and the Eleventh Circuit has not had an opportunity to fashion a test fitting the circumstances in this case.  The Government, however, concedes that the test adopted by the Ninth Circuit in McCarty is appropriate in these circumstances.  (Docket Entry [49], p. 44-45).

impermissible programmatic secondary purpose, such as finding contraband or searching for evidence of a crime.  See, e.g., McCarty, 648 F.3d at 834.

**B.**     **The Search was Done Pursuant to a Legitimate Administrative Search Scheme**

Muhammad argues the search of his luggage was not part of an administrative search because the search was instigated by ATF Agent Southall, who wanted to open his bag and count the weapons inside.  As a result, Muhammad also argues the search had an investigative purpose and not a lawful administrative purpose.

The search was conducted under a lawful administrative scheme.  An administrative search scheme is valid if the search serves a narrow, but compelling administrative objective, and the intrusion is as limited as is consistent with satisfaction of the administrative need that justifies it.  United States v. Bulacan, 156 F.3d 963, 968 (9th Cir. 1998).  The TSA's administrative search scheme does serve a narrow but compelling administrative objective.  See United States v. Davis, 482 F.2d 893, 910 (9th Cir. 1973) ("A pre-boarding screening of all passengers and carry-on articles sufficient in scope to detect the presence of weapons or explosives is reasonably necessary to meet the need.").  The TSA has responsibility for ensuring the screening of all passengers and property in the airports of the United States. 49 U.S.C. § 44901; 49 C.F.R. §

25

1544.207(b). The screening means a physical examination or non-intrusive methods of assessing whether cargo poses a threat to transportation security. 49 U.S.C. § 44901(g)(5).

Under the administrative scheme, in order to reduce the threat that a loaded weapon may have on passenger and cargo handler safety, federal regulations explain that a passenger may only transport unloaded firearms in checked baggage, and they must be stored within a locked, hard-sided container, for which only the passenger retains the key or combination. 49 C.F.R. § 1540.111. The purpose of the regulation is to ensure that the weapon cannot accidentally discharge and cause an accident. (Tr. 196, 258). The passenger is also required to declare to the air carrier that the manner in which a firearm is stored meets the aforementioned requirements. (Tr. 194); 49 C.F.R. § 1544.203. The airline has an obligation to complete a declaration to be sent with the bag to the TSA for screening. (Tr. 288). The TSA, in turn, has the obligation to ensure that the firearm is unloaded and packed in a hard-sided case. (Tr. 238, 366). In order to ensure passenger safety, TSA officials may inspect the manner in which firearms and/or their ammunition is packaged for flight to make sure that the firearms do not accidentally discharge. (Def.'s Ex. 1; Tr. 194-97, 201, 203). Both Transportation

Security Officers and Air Marshals perform these functions on behalf of the TSA. (Tr. 195-96, 252-56, 258). Thus, this Court concludes that there was a legitimate, administrative search scheme.

Muhammad argues, however, that the search was not conducted pursuant to valid administrative scheme because it was instigated by Agent Southall. In support, Muhammad also argues Agent Southall's instigation was the real reason for the search because the airline representative had already examined the case, and his checked bag had already cleared the TSA inspection at the oversized baggage counter. Muhammad also relies on Manager Babtiste's testimony that the ATF agents wanted to count the number of guns in the case and that Agent Southall was very upset and demanding.

Despite Muhammad's arguments to the contrary, this Court concludes that the search was conducted pursuant to the administrative search scheme. While it is clear that Agent Southall aggressively encouraged the TSA agents to search the luggage, the Court also concludes that Air Marshal Barber conducted the search, consistent with the programmatic purpose of TSA searches, due to Barber's concern that if the firearms were improperly packaged and loaded, a danger could be posed to passengers, airport personnel, and luggage handlers. It is undisputed that Agent Southall did not order

27

anyone at the site to search the luggage, the scene remained under control of the TSA at all times, and the ATF agents did not physically handle the firearms or otherwise physically involve themselves in the inspection. (Tr. 107-08, 260, 360, 365). Furthermore, even if Agent Southall's involvement did spur Air Marshal Barber and other TSA officials to take a closer look in order to ensure that the firearms traveled safely, it is clear that the TSA officials nevertheless made the decision to conduct the search on their own to make sure that the firearms would travel safely. (Tr. 257, 262). Air Marshal Barber credibly testified that he observed Muhammad proceed through the ticket counter line and the oversized baggage area, and despite the fact that Muhammad appeared to declare a firearm, none of Muhammad's luggage had been searched up to that point. (Tr. 250-51). Air Marshal Barber further credibly testified that what concerned him was that there was no visual inspection of the weapons to ensure compliance with federal regulations requiring that the weapons be unloaded, packed in a locked, hard-sided case, and packed separately from ammunition. (Tr. 252). This was the first time Air Marshal Barber had ever observed that no inspection was done to make sure a firearm that had been declared was unloaded. (Tr. 253). Air Marshal Barber further testified that he felt like he had a duty to make sure that the weapons were safe

28

due to what he had observed given that an accidental discharge of the firearms on the airplane could, under certain circumstances, cause a catastrophic loss of life. (Tr. 259-60). Due to Air Marshal Barber's concern and in an effort to make sure that he comported with the TSA's protocols, Barber contacted a supervisor to make sure that it was proper to open the container containing the weapons. (Tr. 253-55, 290-91). After receiving confirmation that inspecting the firearms was consistent with the TSA's protocols, Air Marshal Barber, who had been "highly trained in the manipulation of firearms," inspected each firearm to make sure that each one was unloaded and safe. (Tr. 256-62, 227). Consistent with Air Marshal Barber's testimony, TSA Supervisor Wurzbach testified that Air Marshal Barber inspected each firearm to ensure that each one was unloaded. (Tr. 227).

The mere fact that Air Marshal Barber's decision to further inspect Muhammad's bag may have been responsive to ATF Southall's irritation about the lack of thoroughness in airline and TSA procedures to ensure the safety of passengers, does not render the search unlawful. Indeed, under 49 C.F.R. § 1503.3, members of the general public may report transportation security problems, deficiencies, and vulnerabilities, and the TSA will review and consider the information as well as take appropriate steps to

29

address problems, deficiencies, or vulnerabilities identified. 49 C.F.R. § 1503.3(c). There is no evidence to the contrary indicating that when a member of the public reports a potential transportation security problem that the TSA cannot ameliorate the risk in response.

Muhammad further argues, at a minimum, the evidence in this case demonstrates that Air Marshal Barber and the TSA representatives had an unlawful secondary motive beyond determining that the guns were properly packed and unloaded because Muhammad's bag had already cleared inspection by the airline counter agent and the TSA oversize bag counter, the TSA agent at the oversized bag counter testified that this was the only occasion in which a federal Air Marshal became involved in a search of baggage at his location in his ten years of employment, the TSA did not contact Muhammad and have him return to the counter even though the TSA website indicated that was the proper procedure, ATF agents observed and took part in the search, and there is never a physical inspection of the gun.[4] To the extent that a secondary motive

---

[4] Muhammad's arguments that the ATF agents took part in the search and that there is never a physical inspection of the gun does not find support in the record. There is no indication that the ATF agents handled or otherwise inspected the firearms themselves. Additionally, while it is true that several witnesses testified that the airlines employees do not physically inspect guns traveling in checked luggage, Muhammad does not provide citation to any evidence indicating that TSA agents or

30

of assisting the ATF agents in their investigation is ascribed to Air Marshal Barber, the mere fact that he may have had such a secondary motive does not place the search outside the administrative search exception. Where a warrantless search is conducted pursuant to a lawful administrative scheme with a constitutionally permissible motivation, the subjective motive of the individual conducting the search will not invalidate the search. United States v. Bulacan, 156 F.3d 963, 833 (9th Cir. 1998). Although Muhammad relies on United States v. Bulacan, 156 F.3d 963 (9th Cir. 1998), for the proposition that the search is no longer for administrative purposes when the searching officer has a dual motive to investigate a crime, Bulacan is distinguishable from the facts of this case. Central to Bulacan's holding was that the administrative search scheme itself imposed an additional, impermissible motive unrelated to the administrative purpose such that the individual officers in exercising the broad discretion granted them, could conduct more extensive searches based on the secondary law enforcement motive. McCarty, 648 F.3d at 833. In Bulacan, the administrative search scheme itself imposed an unlawful secondary motive, requiring screeners at a

---

federal Air Marshals working for the TSA never inspect firearms within luggage. (Tr. 199). Indeed, the TSA website information provided by Muhammad indicates that the hard-sided case may be searched. (Def.'s Ex. 1).

federal building to search not only for explosives, but also for narcotics. <u>Bulacan</u>, 156 F.3d at 968, 970. In contrast, the TSA's administrative search scheme itself does not suffer from an impermissible programmatic secondary purpose–in that TSA screeners are not urged to search for evidence of a crime as part of their assigned duties. <u>McCarty</u>, 648 F.3d at 834. Instead, the TSA search scheme is focused solely on the discovery of threats to air travel safety. <u>McCarty</u>, 648 F.3d at 834. Under these circumstances, the inquiries into the searching official's discretion and search intent at issue in <u>Bulacan</u> is not at issue in this case. <u>McCarty</u>, 648 F.3d at 834, <u>citing</u> <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 45-46 (2000) (noting that the purpose inquiry in the context of intrusions undertaken pursuant to a general scheme without individualized suspicion is conducted only at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene).

Additionally, the fact that the luggage cleared the airline ticket counter agent and the oversized baggage station does not show that the search was not done pursuant to the administrative scheme. First, the airline counter agent does not normally inspect luggage or the contents of the hard-sided case. (Tr. 234-36, 253-54, 287-88). Thus, the fact that the luggage cleared the airline ticket counter is not of any importance. Second,

32

the fact that the search occurred after Muhammad left, does not mean that the search deviated from the administrative search scheme. TSA Supervisor Wurzbach testified that if TSA agents feel it necessary to further inspect a bag after the bag has initially cleared and the passenger has left, the TSA agents are permitted to do so. (Tr. 227). No evidence presented to the Court provides otherwise. Furthermore, Air Marshal Barber's involvement does not take the search outside the administrative search scheme because Air Marshal Barber credibly testified that although in the past, he had not been involved in performing searches at the oversized baggage counter, he has performed searches throughout the airport and has been involved in conducting searches when the search involves a firearm. (Tr. 255-56, 293-94, 303).

Additionally, although Muhammad was not contacted prior to the search of his luggage, this Court is not persuaded that the failure to contact him was a deviation from procedure removing the search from the administrative scheme. TSA Supervisor Wurzbach states that TSA agents are not required to contact the passenger before further inspecting a container inside of luggage if they can open the container on their own and that they only need to leave a card in the suitcase indicating that the bag was inspected. (Tr. 232-33, 239). While it is true that information Muhammad presented from the TSA

33

website indicates that the passenger would be contacted if the security officer had to open the container, the context of the information shows that it assumes a situation where the TSA agent must break into a locked container, causing the lock to be broken. TSA procedure provides:

> We recommend that you provide the key or combination to the security officer if he or she needs to open the container. You should remain in the area designated by the aircraft operator or TSA representative to take the key back after the container is cleared for transportation. If you are not present and the security officer must open the container, we or the airline will make a reasonable attempt to contact you. If we can't contact you, the container will not be placed on the plane. Federal regulations prohibit unlocked gun cases (or cases with broken locks) on aircraft.

(Def.'s Ex. 1). Thus, the import of the passage appears to be that if the TSA agents have to break the lock, the container can no longer be boarded on the plane because federal regulations prohibit the airlines from placing unlocked containers housing firearms on the airplane. Furthermore, it is logical that the limited information on the TSA website does not include all of the TSA procedures for screening firearms brought for transport. Thus, this Court cannot discredit Supervisor Wurzbach's testimony that TSA agents can open a passenger's luggage or container without contacting the passenger if they know the combination for the container and can open it without disturbing the passenger. (Tr. 232-33, 239, 301). Similarly, Wurzbach's testimony that luggage can be searched

34

outside the presence of the passenger is consistent with Air Marshal Barber's and TSA Manager Babtiste's testimony. (Tr. 301, 362-63).

Muhammad also suggests the search of the luggage could not have been done to ensure the safety of passengers because Spirit Air Counter Agent Regina Kelley had already visually inspected the weapon. This Court, however, does not credit Kelley's testimony that she visually inspected Muhammad's luggage. Kelley's memory of the day was not clear and was sketchy. (Tr. 182, 187-90). Air Marshal Barber credibly testified that Kelley did not search Defendant's bag. (Tr. 249-50). Furthermore, both Air Marshal Barber and Supervisor Wurzbach credibly testified that the airline is not responsible for inspecting the firearm or the luggage carrying it and that it is the TSA's responsibility to do so. (Tr. 234-36, 287-88). Muhammad also argues the inspection could not have been done to ensure the safety of passengers because ATF Agent Southall admitted that a visual inspection would not detect whether a weapon is loaded and that inspecting the gun would not be advisable in an airport setting. (Tr. 165). Muhammad, however, misconstrues Agent Southall's testimony, which was that the airline might not be able to tell whether the gun was loaded, but that there are methods to tell whether a gun is loaded. (Tr. 165). Agent Southall made no statement as to

35

whether an individual who was trained in the ability to handle firearms would be able

to determine whether a gun was loaded.

**C.     Air Marshal Barber's Actions Were not Always Cabined to the Scope of the Permissible Administrative Search**

Determining whether the searcher's actions are cabined to the scope of the

permissible administrative search involves examining whether the searcher exceeded the

scope of the administrative search by becoming more extensive or intensive than

necessary, in light of current technology, to determine whether the guns were unloaded

and safely packaged.[5]  McCarty, 648 F.3d at 835.  Where the action is taken that "cannot

_____

[5] The Government also argues that Muhammad consented to the search when he checked his luggage.  Even assuming that searches of luggage at airports are justified on the ground that the passenger's "implied consent" is irrevocable, thus permitting screeners to search throughout the checked luggage and all closed containers within it, in the Eleventh Circuit, the scope of the search is limited to the scope of the passenger's consent. United States v. DeJesus, 435 F. App'x 895, 901 (11th Cir. 2011); United States v. Simpson, 259 F. App'x 164, 165 (11th Cir. 2007), cert. denied Simpson v. United States, 552 U.S. 1327 (2008).  A passenger's implied consent would be limited to protecting the passengers from harmful air cargo.  See United States v. Doe, 61 F.3d 107, 11-12 n.7 (1st Cir. 1995), citing Florida v. Jimeno, 500 U.S. 248, 252 (1991) (noting that warrantless "consent"-based searches are limited in scope by the terms of defendant's consent); see also, e.g., Herzbrun, 723 F.2d at 777 n.5 (explaining that an airport checkpoint search is reasonable "so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with the reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air"); United States v. Wehrli, 637 F.2d 408, 409-10 (5th Cir. 1981) (affirming

36

serve the administrative purpose–either because the threat necessitating the administrative search has been dismissed, or because the action is simply unrelated to the administrative goal–the action clearly exceeds the scope of the permissible search." McCarty, 648 F.3d at 835. Here, the administrative purpose of the search was achieved once Air Marshal Barber ensured that the weapons were properly packaged in a hard-sided container and unloaded. However, no administrative purpose was served by Air Marshal Barber reading out the make, model, and serial numbers of the firearms to ATF agents. (Tr. 107). Air Marshal Barber's providing information to ATF agents does not help ensure passenger safety from loaded or improperly packed weapons. Furthermore, Air Marshal Barber's holding the firearm declaration, placing the firearms on the table so that the serial numbers were face up, and allowing the ATF agents to take photographs of the contents of Muhammad's luggage at close range also bears no connection to the administrative purpose of the search. (Tr. 111, Gov't's Ex. 4A-4N).

---

district court's finding that the search at an airport checkpoint was a consensual search after noting that screener's task was to insure that defendant's bag "was devoid of skyjacking weapons," and the search "did not range beyond an area reasonably calculated to discover dangers to air safety"). There is no indication in this case that Muhammad's implied consent extended beyond checking to see if the weapons were unloaded and properly packed to allowing the Air Marshal to read the make, model, and serial numbers of weapons to ATF agents and allowing ATF agents to take photographs of the contents of his luggage at close range.

These actions by Air Marshal Barber rendered the search more intrusive than necessary to ensure the safety of the public. (Tr. 111). Thus, the point at which Air Marshal Barber began reading serial numbers and ATF agents began taking pictures, the search no longer served its administrative purpose and solely served an investigative purpose. Accordingly, this Court concludes that Muhammad's Motion to Suppress should be **GRANTED IN PART**. Docket Entry [27]. Information about the make, model and serial numbers of the firearms read by Air Marshal Barber to the ATF agents should be **SUPPRESSED**.[6] (Tr. 107, 171, 261). For the same reasons, the photographs of the weapons and the contents of the gun case should be **SUPPRESSED**. Any personal observations of the ATF agents, airline workers and TSA screeners prior to the point in which the serial numbers were read aloud and photographs were taken should not be suppressed because the search was not being extended beyond the administrative purpose at that time. See McCarty, 648 F.3d at 831 ("[O]nce a search is conducted for a criminal investigatory purpose, it can no longer be justified under an administrative search rationale.")

---

[6] To the extent that the model and serial numbers of the firearms were obtained from some other source, such as the pawn shop, that issue was neither argued nor addressed in this Report and Recommendation.

AO 72A
(Rev.8/82)

## DEFENDANTS' MOTION TO SUPPRESS EVIDENCE OBTAINED FROM THE TRAFFIC STOP ON OCTOBER 23, 2010

## I.    BACKGROUND

Deputy Sheriff Michael Ellinger, who serves as a Patrol Supervisor with the Frederick County, Virginia Sheriff's Office, began following a Jeep sports utility vehicle with a Florida license plate on Interstate 81 in the western part of Virginia on October 23, 2010, at approximately three o'clock in the morning. (Tr. 9-10, 12). After maintaining a certain distance behind the Jeep, Deputy Sheriff Ellinger observed that the Jeep was traveling at a speed between ninety-five to ninety-eight miles per hour in a sixty mile per hour zone, momentarily dropped its speed to eighty miles per hour, and then resumed the higher speeds again. (Tr. 10, 12). Deputy Sheriff Ellinger turned on his blue lights and pulled over the Jeep onto the shoulder of the road at approximately 3:19 a.m. (Tr. 12-13). Deputy Sheriff Ellinger walked to the driver's side door and asked the driver, later identified as Defendant Muhammad, for his driver's license and registration. (Tr. 13-14). Defendant Ross was on the passenger's side of the vehicle. (Tr. 33). Deputy Sheriff Ellinger next went back to his patrol car where he filled out a Virginia Uniform Summons, which is a traffic ticket, for reckless driving, while Muhammad and Ross remained in the Jeep. (Tr. 13, 18). While Deputy Sheriff Ellinger

was writing the ticket, a State Trooper arrived on the scene and parked behind the Deputy Sheriff Ellinger's patrol car. (Tr. 23-24). Another Deputy Sheriff arrived and parked behind the State Trooper. (Tr. 23-24).

Deputy Sheriff Ellinger requested that Muhammad step out of the Jeep and walk back to Deputy Sheriff Ellinger's patrol car, so that he could talk to him without the threat of being struck by another vehicle on the interstate. (Tr. 19). At the front of Deputy Sheriff Ellinger's cruiser, Ellinger issued the ticket to Muhammad and asked Muhammad if he had any guns, weapons, drugs, bazookas, hand grenades, or anything in the car and whether Muhammad would mind if he checked inside the Jeep. (Tr. 21-22, 58). Muhammad gave his permission for the search, and did not place any limitations on his consent. (Tr. 18-19, 22). At the time, Deputy Sheriff Ellinger did not draw his weapon, did not restrain the Defendants, and kept his tone of voice only a little louder so that Muhammad could hear him over the road noise. (Tr. 23, 47). Cars proceeded by on the interstate from time to time and at times, it was hard to hear, but Deputy Sheriff Ellinger was able to hear Defendants during the search. (Tr. 21, 57-58). None of the officers on the scene made any threats or promises to secure Muhammad's consent. (Tr. 47).

40

Defendant Ross remained in the passenger side of the Jeep. (Tr. 19). Deputy Sheriff Ellinger approached Ross and asked him for identification and Ross gave him a concealed weapons permit from Georgia. (Tr. 23). Deputy Sheriff Ellinger asked Ross whether he had a gun. (Tr. 23). Because Ross started to reach towards the center console, Deputy Sheriff Ellinger instructed him not to get the gun, but just to step out of the Jeep. (Tr. 23, 31, 77). Deputy Sheriff Ellinger patted Ross down and then escorted him back to the police cars where the other law enforcement officers stood. (Tr. 26, 27).

While Deputy Sheriff Ellinger conducted the search, the State Trooper and the other Deputy Sheriff stood back at Deputy Sheriff Ellinger's patrol car, which was about twenty-five or thirty feet away, with Defendants and watched over them. (Tr. 24-25, 27-28). While there was road noise at the time, when Deputy Sheriff Ellinger spoke loudly, the Defendants were able to respond to his questions. (Tr. 28). At some point, one of the Defendants indicated that he was cold and asked to sit inside the patrol car. (Tr. 28). The door to the patrol car remained open while that Defendant sat in the car. (Tr. 45).

Deputy Sheriff Ellinger searched the center console of the Jeep and discovered a loaded Ruger handgun. (Tr. 28). Next, Deputy Sheriff Ellinger searched behind the

41

driver's seat and discovered a cardboard box containing four or five handguns that had been purchased at a pawn shop as well as a receipt. (Tr. 29). Next, Deputy Sheriff Ellinger searched the spare tire compartment and found between two and four more firearms and a receipt with Muhammad's name on it. (Tr. 34-35). During the search, Deputy Sheriff Ellinger called in all of the serial numbers for the handguns to dispatch to make sure the firearms were not stolen. (Tr.28-35, 42). Deputy Sheriff Ellinger also asked other officers whether Ross's concealed weapon permit issued in Georgia was effective in Virginia. (Tr. 36). According to Deputy Sheriff Ellinger, he was misinformed about whether Virginia honors Georgia's concealed gun permits. (Tr. 36).

Neither Defendant ever requested Deputy Sheriff Ellinger to stop searching. (Tr. 35-36). At approximately 4:21 a.m., Deputy Sheriff Ellinger allowed Defendants to leave. (Tr. 42, 47). Neither Defendant ever complained or asked Deputy Sheriff Ellinger to cease searching. (Tr. 44-45, 56). None of the other law enforcement officers on the scene indicated to Deputy Sheriff Ellinger that either Defendant had a concern about the search. (Tr. 45)

## II.   LEGAL ANALYSIS

Defendants contend that the search of the Jeep was unconstitutional because given that Deputy Sheriff Ellinger required them to exit the Jeep and move to the front of

Deputy Sheriff Ellinger's patrol car, they could not be heard if they desired to revoke their consent to the search. An exception to the requirement that law enforcement obtain a warrant to conduct a search is when consent is given by an individual possessing authority to do so. Georgia v. Randolph, 547 U.S. 103, 106 (2006), citing Schneckloth, 412 U.S. at 222. "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995). The principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession--i.e., whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances. See Johnston v. Tampa Sports Auth., 530 F.3d 1320, 1326 (11th Cir. 2008), cert. denied, --- U.S. ---, 129 S. Ct. 1013 (2009); Tovar-Rico, 61 F.3d at 1535. Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. Johnston, 530 F.3d at 1326. Ultimately, the burden is on the government to prove the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily. United States v. Hidalgo, 7 F.3d 1566,

43

1567, 1571 (11th Cir. 1993).

A consent search is manifestly reasonable so long as it remains within the scope of the consent. United States v. DeJesus, 435 F. App'x 895, 901 (11th Cir. 2011). Thus, a consensual search is confined to the terms of its authorization. United States v. Simpson, 259 F. App'x 164, 165 (11th Cir. 2007), cert. denied Simpson v. United States, 552 U.S. 1327 (2008). The standard for measuring the scope of a suspect's consent is objective reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect. Simpson, 259 F. App'x at 165; United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir.1999).

In this case, it is undisputed that Muhammad initially gave consent to the search of the Jeep. Furthermore, there is no real dispute that the circumstances under which Muhammad gave his initial consent was voluntary. At the time, Deputy Sheriff Ellinger did not draw his weapon, restrain the Defendants, or yell at them. (Tr. 21, 23, 47). None of the officers on the scene made any threats or promises to secure Muhammad's consent. (Tr. 47). Both Defendants appeared to be of normal intelligence, both appeared to understand, and did not appear to be under the influence of drugs or alcohol. (Tr. 45-46).

Instead, Defendants argue, without support, that their continued consent was not

44

voluntary because given their distance from Deputy Sheriff Ellinger, they could not revoke Muhammad's consent because Deputy Sheriff Ellinger would not hear them. This Court is not persuaded by Defendants' theory that they were effectively prohibited from revoking Muhammad's consent. Deputy Sheriff Ellinger credibly testified that while there was some road noise and that it could be loud, he had been communicating with Defendants during the search and they could hear him. (Tr. 57-58). Additionally, to the extent Defendants were concerned that the search was taking place outside their immediate presence thereby preventing them from revoking their consent to the search, they could have revoked their consent directly to Deputy Sheriff Ellinger when he brought them to stand near his patrol car. Furthermore, the undisputed testimony is that Muhammad did not place any limitations on his consent for the search. Thus, this Court cannot infer that Muhammad would not have granted his consent if he knew that the search would take place outside his immediate presence. Furthermore, it is clear to this Court that even if the Defendants were not able to get Deputy Sheriff Ellinger's attention due to road noise conditions, they nevertheless could have communicated any concerns with the other officers on the scene and ask that they relay such concerns to Deputy Sheriff Ellinger. Furthermore, the Defendant who chose to wait in the patrol car could have expressed any concern he had to the other officers. However, the undisputed

45

testimony is that the door to the patrol car remained open and that neither Defendant complained or expressed any desire to revoke Muhammad's consent to the search. Under these circumstances, this Court concludes Muhammad's consent was voluntary and the manner in which the search was conducted was reasonable. See Simpson, 259 F. App'x at 166 (concluding that the fact that officers handcuffed occupants of home during search did not negate consent because the officers were investigating a report that gunshots were fired); United States v. Fernandez, 58 F.3d 593, 597-98 (11th Cir. 1995) (rejecting conclusion that consent for search was not voluntary where defendant argued that law enforcement officers promised him that he would be present for search but immediately brought him to jail after he signed a search authorization because court was unpersuaded that law enforcement officers made promise, consent to search form did not indicate any limitations on the defendant's consent, and defendant, who was a former law enforcement officer, permitted himself to be taken to jail without mentioning the alleged promise made to him and without asking to be present during the search); cf. Maryland v. Wilson, 519 U.S. 408, 411-15 (1997) (concluding that it was not unreasonable to order suspects out of a car during a traffic stop in order to protect the officer's safety). Accordingly, Defendants' Motion to Suppress the Search of the Jeep Compass Conducted on October 23, 2010, should be **DENIED**. Docket Entry [25].

46

## CONCLUSION

For the foregoing reasons, this Court **ORDERS AND RECOMMENDS** as follows:

(1)    Defendant Muhammad's Motion to Suppress Evidence should be **GRANTED IN PART**.  Docket Entry [26].

(2)    Defendant Muhammad's Motion to Suppress Statements is **DEEMED WITHDRAWN.**  Docket Entry [27].

(3)    Defendant Muhammad's Motion to Adopt Defendant Kaishaun Ross's Motion to Suppress the Results of the Search of the Jeep Compass Conducted on October 23, 2010, is **GRANTED**.  Docket Entry [30].

(4)    Defendants' Motion to Suppress the Search of the Jeep Compass Conducted on October 23, 2010, should be **DENIED**.  Docket Entry [25].

(5)    Defendant Ross's Motion to Sever Parties is **DEFERRED TO THE DISTRICT COURT**.  Docket Entry [31].

There are no further motions or problems pending before the undersigned to prevent the scheduling of this case for trial.  Therefore, this action is **CERTIFIED READY FOR TRIAL**.

47

**SO ORDERED, REPORTED AND RECOMMENDED** this <u>16th</u> day of

October, 2012.

<div style="margin-left: 45%;">

<u>/s/ Linda T. Walker</u>

LINDA T. WALKER

UNITED STATES MAGISTRATE JUDGE

</div>

AO 72A
(Rev.8/82)