FILED IN CHAMBERS
U.S.D.C. - Atlanta

JAN 1 4 2013

James N. Hatten, Clerk
By: Am Cauel
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ABRAHAMAN MUHAMMAD and
KAISHAUN VALENTINO ROSS

CRIMINAL CASE NO.

1:11-CR-488-ODE-LTW

#### ORDER

This criminal case comes before the Court on the United States Government's objections [Doc. 66] and Defendant Abrahaman Muhammad's ("Muhammad") objections [Doc. 67] to a Report and Recommendation ("R&R") entered on October 16, 2012, by United States Magistrate Judge Linda T. Walker [Doc. 61]. In this R&R and Order, Judge Walker deems withdrawn Muhammad's motion to suppress statements [Doc. 27], and grants Muhammad's motion to adopt Defendant Kaishaun Valentino Ross' ("Ross") motion to suppress the results of the search of the Jeep [Doc. 30]. Judge Walker recommends that this Court grant in part Muhammad's motion to suppress evidence from an alleged administrative search occurring December 23, 2010 [Doc. 26],[1] and deny the Motion to suppress the search of the Jeep Compass [Doc. 25]. Judge Walker deferred to this Court ruling on Ross' motion to sever parties [Doc. 31]. Lastly, Judge Walker certified this case ready for trial [Doc. 61 at 47].

---

[1] In Defendant Muhammad's post-hearing brief, he withdraws his challenges to the events on December 31, 2010, which previously comprised part of this motion to suppress [see Doc. 48 at 1 n.1].

For the following reasons, the Government's objections [Doc. 66] are OVERRULED, Defendant Muhammad's objections [Doc. 67] are GRANTED IN PART and DISMISSED AS MOOT IN PART, and the R&R [Doc. 61] is ADOPTED IN PART and REJECTED IN PART. Muhammad's motion to suppress all evidence and testimony from the December 23, 2010 search [Doc. 26] is GRANTED. However, Muhammad's motion to suppress the search of the Jeep Compass [Doc. 25] is DENIED, and his subsequent motion to suppress the results of the search of the Jeep Compass [Doc. 63] is DISMISSED AS MOOT. Lastly, Defendant Ross' motion to sever parties [Doc. 31] is DISMISSED AS MOOT.

I.    Background[2]

On October 25, 2011, the grand jury returned an eighteen-count indictment against Muhammad and Ross ("Defendants"), including one count of conspiracy to make false statements to a federally licensed firearms dealer with respect to records of the firearms dealer in violation of 18 U.S.C. § 924(a)(1)(A), and two counts for aiding and abetting each other by causing false representations to be made concerning information required to be kept in the records of a federal firearms licensee in violation of 18 U.S.C. §§ 924(a)(1)(A) and (2). Muhammad is also charged with fourteen counts of causing false representations to be made with respect to information required to be kept in the records of a federal firearms licensee in violation of 18 U.S.C. § 924(a)(1)(A), and one count of engaging in the business of

_____

[2]Judge Walker held suppression hearings on March 8, 2012 and April 10, 2012 [Docs. 39; 40]. The Court adopts the facts as found by Judge Walker in the R&R, noting and addressing any objections asserted by Muhammad to those facts below.

2

dealing in firearms without being a federally licensed dealer, in violation of 18 U.S.C. § 922(a)(1)(A).

## A. *Events of December 23, 2010*[3]

### 1. ATF Agents Conduct Surveillance of Defendants

On December 23, 2010, Agent Benjamin Southall, who has served the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") for twenty-one years and investigates violations of federal firearms laws, and Special Agent Michael Roland, who has served with the ATF since June 2001 and primarily investigates firearm violations, conducted surveillance on Muhammad [Tr. 87-91, 305-08].[4] The agents received a tip from a pawn shop dealer that Muhammad purchased a number of firearms from the pawn shop [Tr. 91-92]. Agent Southall observed Muhammad leave the pawn shop with the firearms and enter a car with Ross [Tr. 93]. The agents observed the car proceeding to the airport [Tr. 96].

The agents continued their observation inside the airport and at some point, contacted two Air Marshals for assistance because they were on their territory and they were concerned that Muhammad's bag, perhaps containing the firearms, would make it past security on the main level of the airport and on to a lower level distribution area to be sent down to the airplane, without

---

[3]The Court has omitted the facts related to the October 23, 2010 search of the Jeep Compass, as no party has submitted objections to Judge Walker's ruling on the related motion [Doc. 25]. After reviewing the ruling on this motion for clear error, the Court adopts Judge Walker's recommendation that this motion [Doc. 25] be denied.

[4]References to the suppression hearings transcript are cited as "Tr. at" page number. Documents 39 and 40 respectively contain pages 1-270 and pages 271-373 of the transcript.

3

being inspected [Tr. at 98-99, 100-02, 162-63]. Agent Southall explained that the agents were conducting surveillance on Muhammad and that they were unsure whether Muhammad was there to drop off a bag or check a bag and get on a flight [Tr. at 244-45, 255]. A supervisor asked Michael Barber, who has served as a federal Air Marshal for ten years, to help Agent Southall familiarize himself with the airport [Tr. at 244-46, 255]. Air Marshal Barber also works for the Transportation Security Administration ("TSA") and is responsible for ensuring compliance with regulations that the TSA enforces [Tr. at 244-45, 255]. Air Marshal Barber met with Agent Southall and showed him the manner in which a bag may proceed through the airport if it was checked [Tr. at 246].

> 2. Muhammad Declares that he has a Weapon in his Bag, but his Bag Clears the Airline Ticketing Counter Without Inspection

After several hours, Agent Southall observed Muhammad obtain a ticket from the Spirit Airlines ticket counter, walk towards the oversized baggage area, check his baggage, and walk away [Tr. at 98-99, 162, 284]. Agent Southall testified that he talked with a supervisor, Robert McGowan, from Spirit Airlines to see if a Spirit Airlines representative had looked in Muhammad's bag to make sure any firearms were unloaded, but learned that no one from Spirit Airlines had done so [Tr. at 100, 103-04, 156, 162]. McGowan took the position that it is the TSA's job to inspect the weapon [Tr. at 103-04, 156, 162]. Agent Southall told McGowan that he could not believe that the airline employees did not look at the guns to make sure they were unloaded [Tr. at 164]. McGowan responded that there had been an incident involving an accidental discharge of a weapon [Tr. at 164]. Special Agent Roland

4

similarly testified that they were "in absolute[] awe" that a civilian could have a gun in his or her luggage and not face a thorough inspection [Tr. at 330]. Agent Southall admits, however, that one could look at the gun until he or she is "blue in the face," but would not be able to tell if the gun is loaded or not [Tr. at 165].

Agent Southall believes that the person who waited on Muhammad at the Spirit Airlines ticket counter was Regina Kelley [Tr. at 156]. Kelley testified that she is familiar with the procedures for processing passengers who declare firearms, that weapons and ammunition have to be separated, and that a weapon has to be in a hard-shell container [Tr. at 178-79]. According to Kelley, when a passenger advises her that he or she is traveling with a firearm, she requires them to complete a declaration form [Tr. at 178]. Kelley testified that she always requires the passenger to open his or her bag to show her the firearm, but she never touches the firearm or checks to see if the firearm is loaded or unloaded [Tr. at 178-79, 181, 187]. Kelley states that she just asks the passenger whether the firearm is unloaded [Tr. at 179, 187].

While Kelley handled customers who travel with firearms, on average, twice a week, there was only one occasion in which Kelley recalls law enforcement officers being involved [Tr. at 179-80]. Although Kelley does not remember the names of the law enforcement officers who approached her, Kelley remembers that between 4:00 p.m. and 5:30 p.m. on the day in question, her supervisor told her that a male passenger would be coming in and checking a firearm and that she was to check him in the regular manner [Tr. at

5

183-85, 187]. About five minutes later, Kelley waited on a passenger who declared a firearm [Tr. at 181, 186]. Kelley claims that the passenger opened his case and she visually inspected the firearm [Tr. at 181, 186]--testimony which the Magistrate Judge did not fully credit.

In contrast, Air Marshal Barber testified that he observed Muhammad interact with the ticket agent and that the ticket agent merely accepted paperwork completed by Muhammad, but did not open Muhammad's bag [Tr. at 249-50]--testimony which the Magistrate Judge found credible. According to Air Marshal Barber, however, this was not improper [Tr. at 287]. Air Marshal Barber testified that the passenger has a duty to state that he or she is carrying a weapon in the bag, and the airline has the responsibility to complete paperwork and have a declaration sent to the TSA for screening [Tr. at 288]. At that point, the inspection of the bag is the TSA screening officer's obligation [Tr. at 288].

Consistent with Air Marshal Barber's understanding, Elizabeth Shockley, who has served as the Assistant Federal Security Director for Inspections with the TSA for ten years, testified that the individual airlines are prohibited from inspecting a gun to determine whether it is loaded or unloaded [Tr. at 192, 199]. Instead, the airline requires that a passenger complete a declaration form indicating that the firearm is unloaded, packed in a hardsided, locked container, and that only the passenger has control of the lock [Tr. at 199-200] (as noted above, Muhammad completed such paperwork). The airline takes the passenger's declaration at face value [Tr. at 200]. The luggage is then tendered to the airline, but sent to the TSA for screening [Tr. at

6

195]. The TSA has the authority to check the case to determine whether it is locked and to ensure compliance with regulations [Tr. at 197].

> 3. After Muhammad's Bag Clears Inspection by the TSA Oversized Bag Counter, Agent Southall Suggests to Air Marshal Barber that he Open the Bag to Ensure the Guns Were Unloaded and Properly Packaged

Agent Southall, other agents, and Air Marshal Barber went to the oversized baggage counter, which is run by the TSA, but did not approach Muhammad because they did not want him to know that they were following him [Tr. at 100]. Once Muhammad and his bag arrived at the oversized baggage counter, the TSA agent there swabbed the bag for explosives but did not check inside the bag [Tr. at 104, 251, 289]. Afterwards, the TSA agents simply leaned Muhammad's bag against the wall, presumably for transport to the aircraft [Tr. at 105].

Because no one had looked in Muhammad's bag to make sure the firearms were unloaded, Agent Southall suggested to Air Marshal Barber that he look in the baggage to make sure the guns were packaged properly, were unloaded, and were being properly transported [Tr. at 103, 105, 243]. Agent Southall was visibly upset at the time over the TSA's failure to look in Muhammad's bag because usually when he travels with declared guns, the TSA agent opens his bag, takes everything out, and searches through the bag [Tr. at 108, 159, 300]. Nevertheless, both Agent Southall and Air Marshal Barber agree that Agent Southall did not order or demand anyone to go into Muhammad's bag [Tr. at 108, 260].

Air Marshal Barber testified that he asked the TSA agent at the oversized baggage counter whether he was going to do an

7

inspection of the declared weapon, and the TSA agent indicated that he was not going to do so. Air Marshal Barber was concerned that because there had not been a visual inspection of the weapon, the manner in which the weapon was packed might not comply with federal regulations [Tr. at 252-54]. Air Marshal Barber also testified that he wanted to make sure that the gun was packed in a locked, hardsided case, the gun was unloaded, and any ammunition was separated from the gun [Tr. at 252]. According to Air Marshal Barber, this was the first time he ever observed that there was no inspection to make sure that a firearm was unloaded [Tr. at 253].

Air Marshal Barber also testified that because he was unsure whether the TSA has an obligation to check inside luggage once a weapon is declared, he asked for the assistance of a supervisor [Tr. at 252-54, 289-90]. According to Air Marshal Barber, a male supervisor appeared within a couple of minutes [Tr. at 254, 290]. Air Marshal Barber explained to the TSA supervisor that he was concerned that there were weapons inside the bag that were not screened according to federal regulation requirements and explained that he would like to look inside the bag [Tr. at 105, 254-55]. The supervisor agreed to allow Air Marshal Barber to open the luggage [Tr. at 256]. For the first time during his tenure as a federal Air Marshal, Barber inspected the luggage at the oversized baggage counter [Tr. at 252]. Prior to the search of Muhammad's bag, Air Marshal Barber's searches of luggage containing weapons had always been conducted in the secured room in the lower level of the building [Tr. at 293-94, 303].

Although Air Marshal Barber is not a screener, his job duties include making sure that there is not a potential threat to safety

8

or security [Tr. at 255]. That means that from time to time Air Marshal Barber will be involved in looking through bags [Tr. at 255]. Air Marshal Barber testified that he has inspected luggage in several areas of the airport, including those opened to the public such as the main security checkpoint and the international checkpoint's secondary screening area [Tr. at 303].

Additionally, if a bag goes to the screening room and a weapon is discovered, TSA inspectors will show up, determine if there is a weapon, and if there is, "there is an attempt made to see the weapon" [Tr. at 255]. If the weapon is in a locked case, if the lock is cut, or if the weapon is unsafe, a call is made to the airline to have the passenger return from the secured part of the airport to meet an officer to take care of the weapon [Tr. at 256].

### 4. Air Marshal Barber Removes and Views the Contents of a Hard Shell Case Inside Muhammad's Bag

A TSA Security Officer opened Muhammad's bag [Tr. at 256, 221]. Once the bag was opened, Agent Southall observed one fifteen by ten by four or five inches tall, hardside case [Tr. at 105]. Although the case had a combination lock, the TSA agent was able to open the hardside case by entering a default combination [Tr. at 106, 221, 257-58]. Agent Southall observed Agent Barber remove one firearm, tattoo equipment below the firearm, and between six to ten more firearms below the tattoo equipment, although Muhammad had only declared one firearm [Tr. at 103, 106-07, 258]. Air Marshal Barber states that he was removing the firearms to ensure that they were not loaded because a loaded weapon could accidentally discharge if baggage handlers handled

9

the luggage roughly, or, with more catastrophic effects, if the firearm was jostled on the aircraft [Tr. at 258]. After inspecting the case and learning that the firearms were unloaded, Air Marshal Barber repacked the guns into the case, put the tattoo equipment on top and put the top firearm back in, left a white note stating that the bag was inspected, and sent the luggage to be boarded onto the plane[5] [Tr. at 115, 225-26]. Air Marshal Barber stated that he thought that his inspection lasted no longer than five minutes [Tr. at 264].

Agent Southall testified that as Air Marshal Barber removed the firearms, Barber read out the make, model, and serial numbers to Agent Southall, who wrote them down[6] [Tr. at 107, 261]. Another ATF agent took photographs during this time [Tr. at 107, 171, 261]. The photographs have been submitted to the Court as Exhibits 4A-4N. The pictures depict the guns at close range and the guns appear to be placed with their model numbers and serial numbers face up [compare Gov't's Ex. 4A-4N with Indictment]. The ATF agents did not handle the guns [Tr. at 227].

Air Marshal Barber's inspection did not occur in the presence of Muhammad [Tr. at 264-65]. No one attempted to call Muhammad prior to opening the bag. Agent Southall testified that he did not ask any TSA agent to contact Muhammad because he did not want Muhammad to know the agents were following him [Tr. at 111]. A

---

[5]The TSA supervisor testified that he thought he put the note in the bag letting Muhammad know that the bag had been inspected [Tr. at 226].

[6]Air Marshal Barber testified that he did not read out the serial numbers, that instead, Southall was bent over the table reading and writing down the serial numbers [Tr. at 261].

10

printout from the website hosted by the TSA, which explains to the public the rules pertaining to traveling with special items, provides that passengers transporting firearms, ammunition, or firearm parts must declare all firearms to the airline during the ticket counter check-in process, ensure that the firearms are unloaded and packed in a hardsided container, and keep the firearms in their checked baggage [Tr. at 350; Def.'s Ex. 1]. It further advises passengers of the following:

> We recommend that you provide the key or combination to the security officer if he or she needs to open the container. You should remain in the area designated by the aircraft operator or TSA representative to take the key back after the container is cleared for transportation. If you are not present and the security officer must open the container, we or the airline will make a reasonable attempt to contact you. If we can't contact you, the container will not be placed on the plane. Federal regulations prohibit unlocked gun cases (or cases with broken locks) on aircraft. . . .

[Def.'s Ex. 1, Tr. at 350-51].

Iona Babtiste, who has been employed as a Security Manager with the TSA since 2002, confirmed that these were the TSA's procedures and that the majority of times passengers were present during searches of their luggage [Tr. at 353-55, 361-66]. Normally, the passenger brings the luggage to the TSA agent to be searched and remains present at all times [Tr. at 353]. If the passenger is not present and the TSA officer must open the container, the TSA lets airline representatives know so that they can try to get the passenger to return to the counter [Tr. at 354]. This procedure is in place due to concerns about theft [Tr. at 362]. According to Babtiste, if the passenger gets on the plane and does not return to the counter, the container is going to remain locked and stay with the TSA [Tr. at 355-56]. Babtiste

11

also confirms that the cards notifying the passenger that his or her luggage has been searched are placed in the luggage when the luggage is searched after it reaches the room on the lower level of the airport [Tr. at 353-55, 361-62]. Babtiste agrees, however, that the passenger's presence for a search is a courtesy and that if a passenger is not present when a bag is searched, there is not necessarily a violation of protocol [Tr. at 363].

TSA Supervisor Harold Wurzbach, who was at the scene, testified that when the inspectors first open a bag belonging to a passenger carrying a gun, the passenger is required to be there to answer questions [Tr. at 214, 226]. Once the bag is cleared, the passenger can leave [Tr. at 226]. TSA Supervisor Wurzbach stated that if they feel it necessary to further inspect a bag that has been turned over to them after the passenger has left, they can do so [Tr. at 227]. Wurzbach claims that they are not required to contact the passenger if they can open the container on their own, and that if they do so, they leave a card in the suitcase indicating that the bag was inspected [Tr. at 232-33, 239].

### 5. Air Marshal Barber Records his Recollection of the Incident in a Memorandum

At Agent Southall's request, Air Marshal Barber wrote a memorandum memorializing the incident [Tr. at 262-63]. In Air Marshal Barber's memo, Barber wrote that he asked TSA Manager Iona Babtiste for authority to inspect the bag. Air Marshal Barber's memorandum provided in part:

Based on my observations of the weapon being declared by the subject, I concluded that the weapon was not visibly inspected by the Airline Ticket Agent for proper checked weapon transport. (A weapon checked for transport on a

12

US airline must be secured in a hard side case and configured in a safe mode and separated from ammunition.). I met with TSA Manager Iona Babtiste and requested that I be authorized to inspect the weapon for proper transport and safety. Manager Babtiste agreed to my request. Upon opening the luggage and the proper hard sided case, I removed several weapons to insure they were safe. Agent Southall took photos and wrote down one serial number during my inspection. I concluded the weapons were properly stored. I repacked the luggage as found and allowed it to continue to the airplane (A TSA letter was placed in the luggage informing the subject that his bag was inspected.). No additional Federal Air Marshal/TSA involvement.

[Def.'s Ex. 2, Tr. at 295]. Air Marshal Barber later testified, however, that after obtaining authorization to open the bag from the male supervisor, he asked for the manager [Tr. at 290]. Air Marshal Barber testified that he felt he needed to talk to the manager because there might be something he did not know that may prevent him from opening the bag [Tr. at 291]. Security Manager Babtiste responded [Tr. at 290]. Air Marshal Barber testified that he did not ask Babtiste for permission to open the case and just discussed with her whether the inspection was proper as he was in the process of repacking the bag [Tr. at 263-64, 296, 336]. Air Marshal Barber testified that his indication to the contrary in his memorandum was a mistake and that he confused the two managers when he wrote the memorandum [Tr. at 296]. According to Air Marshal Barber, he explained his concerns about what he had observed, asked about the process, and asked Babtiste whether she thought what he had done was proper [Tr. at 263, 291-92].

Wurzbach, the TSA supervisor at the scene also testified that he was instructed to open the bag before Babtiste arrived [Tr. at 221-23]. Wurzbach further testified that this was the first time

13

in his nearly ten years of employment with the TSA that an Air Marshal participated in the screening process [Tr. at 229-30].

### 6. Security Manager Babtiste Also Memorializes the Incident in a Memorandum

Security Manager Babtiste confirms that Muhammad's luggage was already opened when she arrived on the scene and that firearms were on the table [Tr. at 340, 343]. Babtiste wrote a memorandum memorializing the incident for herself [Tr. at 341-42, Def.'s Ex. 3]. Babtiste's memorandum states in part:

> On Thursday around 17:42 pm On 12/22/10 I got call from STSO Tom at the North oversize opposite Spirit Airlines. On arrival there were several DEA agents at the table wanting STO Tom to open a gun case and count how many gun ext. They were told what TSA protocol was and Spirit Airlines TSM also told them Airlines protocol. The DEA agent did not understand the protocols that was set in place. When asked can they open the gun case ATSM Jerry Estes present also say go ahead do your job. There was one agent that was very upset and demanding. . . .

[Def.'s Ex. 3]. Babtiste testified that the reason she wrote that the federal agents at the table wanted TSA Supervisor Wurzbach to open the gun case and count how many guns was because Wurzbach told her that was what had occurred [Tr. at 345, Def.'s Ex. 3]. Babtiste contends she was writing information that was conveyed to her by Wurzbach as she remembered it [Tr. at 357]. Babtiste also testified that the reason she came to the scene was because Agent Southall was frustrated by their protocols [Tr. at 346-47]. According to Babtiste, when she arrived, there was "[l]ots of chaos. Everybody talking, you know, what they want us to do, and we were just neutral" [Tr. at 370]. Babtiste memorialized the incident in a memorandum because she was concerned that due to Agent Southall's frustration, the matter could escalate higher and

14

she wanted to make sure that she remembered what to tell her supervisor [Tr. at 347-48]. However, although Babtiste testified that the authorization to open the case was given before her arrival and that the guns were on the table when she arrived, she also testified that Jerry Estes, who is in her chain of command, arrived at the same time she did and told "them to go ahead and do their job if they want to open whatever they want to open" [Tr. at 348]. Babtiste later testified that she was not present when Estes told any "DEA" agents to open the case [Tr. at 358].

II. Preliminary Matters

### A. *Motion to Sever Parties*

On January 24, 2012, Defendant Ross filed a Motion to Sever Parties [Doc. 31]. Judge Walker deferred ruling on this Motion [Doc. 61 at 2]. On December 5, 2012, Ross appeared before this Court and pleaded guilty [Doc. 74]. As a result, Ross' Motion to Sever Parties [Doc. 31] is dismissed as moot.

### B. *Defendant Muhammad's Motion to Adopt Ross' Motion*

On January 6, 2012, Ross filed a motion [Doc. 25] seeking to suppress the results of a search of the Jeep Compass on October 23, 2010. On January 21, 2012, Muhammad filed a motion seeking to adopt Ross' motion to suppress the results of the search of the Jeep [Doc. 30]. In her R&R and Order, Judge Walker granted Muhammad's motion to adopt [Doc. 61 at 2-3], but ultimately recommended denying the motion to suppress (which this Court has adopted). On October 17, 2012, Muhammad filed another motion [Doc. 63], again seeking to adopt Ross' motion to suppress the results of the search of the Jeep. Because, Judge Walker already granted Muhammad's prior motion [Doc. 30], this subsequent

15

motion seeking to adopt Ross' motion to suppress [Doc. 63] is dismissed as moot.

III. Objections to the R&R

### A. *Legal Standard*

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), the Court must conduct a de novo review of those portions of the R&R to which the parties timely and specifically objected. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); FED. R. CRIM. P. 59(b)(3); United States v. Raddatz, 447 U.S. 667, 673-74 (1980). However, for a party's objections to warrant de novo review, he "must clearly advise the district court and pinpoint the specific findings that [he] disagrees with." United States v. Schultz, 565 F.3d 1353, 1360 (11th Cir. 2009). The United States Court of Appeals for the Eleventh Circuit has noted that "[p]arties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988). The Court deems the parties to have waived their right to request review of any portions of the R&R to which each failed to timely and specifically object. FED. R. CRIM. P. 59(b)(2). Such unobjected-to portions will be assessed for clear error only. See Tauber v. Barnhart, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006) (Story, J.) ("[I]ssues upon which no specific objections are raised do not so require de novo review; the district court may therefore 'accept, reject, or modify, in whole or in part, the

findings or recommendations made by the magistrate judge[,]' applying a clearly erroneous standard." (quoting 28 U.S.C. § 636(b)(1))).

### B. *Defendant Muhammad's Objections*[7]

In his objections [Doc. 67], Muhammad challenges the characterization of the facts. Specifically, Muhammad asserts: (1) "[t]he . . . conclu[sion] that no one from Spirit Airlines had made 'sure any firearms were unloaded'. . . . is inaccurate and pursues a 'red-herring'" [Doc. 67 at 2; see also id. at 3 n.1]; (2) while it was "the first time Air Marshal Barber had 'observed that there was no inspection to make sure that a firearm was unloaded,'" this statement is misleading because "this was the first time he had inspected luggage at the oversize counter; all prior screenings had been conducted in the screening room, access to which is limited to authorized personnel, after the alarm had been set off by someone's luggage" [id. at 3-4]; and (3) some statements at the suppression hearing "pertained to a situation where TSA detected a weapon in screening that *had not been declared*" [id. at 4], and thus such statements have no bearing on this case, in which Muhammad made a declaration [Id.].[8] Additionally, Muhammad raises two additional objections: (1) there

---

[7]Defendant Ross also submitted "objections" [Doc. 65]. His filing does not contain specific objections to the R&R, but since he has pleaded guilty they are moot.

[8]Muhammad also asks the Court "to make a de novo review of the record and adopt the pertinent facts as presented in his post-hearing and reply briefs" [Doc. 67 at 4]. While the Court will review, de novo, the portions of the record to which Muhammad specifically objects, the Court will review the remainder of the facts for clear error only.

was no administrative search; and (2) he had a reasonable expectation of privacy.

The Court will start by addressing Muhammad's argument that there was no administrative search. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Warrantless searches are per se unreasonable, Katz v. United States, 389 U.S. 347, 357 (1967), absent some limited exception, such as an administrative search. "The government bears the burden of proving an exception to the warrant requirement." United States v. O'Campo, 381 F. App'x 974, 976-77 (11th Cir. 2010) (citation omitted).

Courts have recognized that airport screening searches can be valid administrative searches, and thus an exception to the requirements set forth in the Fourth Amendment. E.g., United States v. Rosario, No. 1:10-CR-416-WBH-GGB, 2011 WL 4404128 (N.D. Ga. May 11, 2011) (Brill, Mag. J.), adopted by 2011 WL 4404127 (N.D. Ga. Sept. 21, 2011) (Hunt, J.). However, such searches are governed by the Fourth Amendment's reasonableness requirement and there is no administrative search exception when the search is done for criminal investigatory purposes. Specifically, "an airport search remains a valid administrative search only so long as the scope of the administrative search exception is not exceeded; once a search is conducted for a criminal investigatory purpose, it can no longer be justified under an administrative search rationale." United States v. McCarty, 648 F.3d 820, 831 (9th Cir. 2011) (internal quotation marks and citation omitted);

see also Bruce v. Beary, 498 F.3d 1232, 1248 (11th Cir. 2007) ("To meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it" (internal quotation marks and citation omitted)). However,

> as long as (1) *the search was undertaken pursuant to a legitimate administrative search scheme; (2) the searcher's actions are cabined to the scope of the permissible administrative search*; and (3) there was no impermissible programmatic secondary motive for the search, the *development* of a second, subjective motive to verify the presence of contraband is irrelevant to the Fourth Amendment analysis.

McCarty, 648 F.3d at 834-35 (emphasis added).

Muhammad concedes that "[t]he R&R . . . correctly concludes that there was 'no impermissible *programmatic* motive for the search" [Doc. 67 at 5]. However, Muhammad argues that "the search [was] invalid because it was wholly motivated by Southall and there was no longer a TSA interest" [Id.]. Thus, according to Muhammad, Judge Walker "should have found the search of December 23, 2010 illegal and recommended suppression of all evidence seized as a result" [Id. at 4].

While airport and air travel safety is a major concern, the Court finds that the Government has not met its burden of showing a valid administrative search occurred. Based on the evidence presented, or lack thereof, the Court must agree with Muhammad that it appears the search of his luggage was not for an administrative purpose, but rather was for an investigatory purpose. This is not the type of case in which during the course of a search a "second, subjective motive" was developed. Instead, the desire to investigate Muhammad for alleged criminal conduct

spurred and shaped the ensuing search, and the totality of the events and circumstances on December 23, 2010 undermine the Government's argument to the contrary.

### 1. Agents and Officers Present to Investigate

First, it is clear that Agent Southall, Agent Roland, and other accompanying police officers and agents were at the airport to conduct surveillance on Muhammad as part of their criminal investigation. Upon arrival, officers were even sent to the basement of the airport to "wait . . . for [Muhammad's] bags" [Tr. at 216; see also Tr. at 162-63 (Agent Southall responding "[y]eah, I guess, yeah" when asked if he sent people to the basement because he wanted "to be certain that [the] luggage, that [the] box[,] didn't get on the plane without being inspected")]. Additionally, while ATF agents and other officers/agents assisting in the investigation may not have handled the weapons or the bag during the search, it is clear that they were involved as they were able to take pictures of the guns and write down their make, model, and serial numbers.

### 2. Muhammad's Bag Properly Cleared

Second, there is no showing that prior to the search of Muhammad's luggage, in which the guns were removed and photographed, proper protocol was not followed. It is the airline's responsibility to have the customer fill out a declaration form, which Muhammad did. Muhammad then took his luggage to TSA screeners, whose responsibility it is to check the bag [Tr. at 195]. The TSA screeners did in fact swab Muhammad's bag for explosives, a test which came back negative. As a result,

20

Muhammad's bag was *cleared* and set aside to be loaded onto the plane.

While TSA screeners are charged with screening luggage and they have the right to physically inspect bags, there is no indication that a physical inspection of declared weapons is a requirement. At the suppression hearing it was merely stated that TSA screeners "can" open a bag containing a declared firearm, not that they "must" open the bag and physically inspect the declared gun contained therein [Tr. at 233]. Hence, there is no showing that prior to the search at issue, protocol was not followed by TSA screeners.

Instead, the search was spurred by Agent Southall's involvement--again, an ATF agent who was only present at the airport to investigate a criminal suspect.[9] While Agent Southall's own experience may have been that his own guns were physically checked when he declared them, this does not show that proper protocol was not followed with Muhammad's bag and thus there was a need to perform the search at issue. Again, the search occurred after Muhammad's bag had already been cleared by TSA screeners. McCarty, 648 F.3d at 835 ("[W]here an action is taken that cannot serve the administrative purpose--either because the threat necessitating the administrative search has been dismissed, or because the action is simply unrelated to the administrative goal--the action clearly exceeds the scope of the permissible search.").

---

[9]Agent Southall also explained at the suppression hearing that he was the one who "suggested" they look into the bag to see if the guns were being "properly transported" [Tr. at 103].

21

### 3. Investigation Shaped the Search

Third, while Air Marshal Barber testified that he conducted the search due to safety concerns, the oddities and occurrences on the date in question take this search out of the realm of a valid administrative search. For example, if the purpose of the search was really to allay safety concerns, Air Marshal Barber or other TSA agents could have stopped Muhammad at the oversized baggage checkpoint and had the weapons physically inspected then. Instead, all parties involved waited until *after* Muhammad left this screening area. The only reason the Court can see for why this "need" for an inspection of the declared gun was not brought to the screeners' attention at the time Muhammad was present, was out of concern for damaging the underlying investigation.

Similarly, the fact that no attempt was made to reach Muhammad before his luggage was searched shows there was more going on than safety concerns. TSA policy provides: "[i]f you are not present and the security officer must open the container, we or the airline will make a reasonable attempt to contact you" [Def.'s Ex. 1, Tr. at 350-51]. While contacting the passenger prior to a search may be a "courtesy" and bags have been opened outside the presence of their owners before [Tr. at 239], it is telling that here no attempt was made to contact Muhammad because Agent Southall "didn't want them to have to call the Defendant to come back and open it, [because] then he would know we were following him" [Tr. at 107-08; see also Tr. at 101]. Thus, again, a desire to investigate alleged criminal activity shaped the conduct of those involved in the search.

22

Additionally, Air Marshal Barber's overall involvement in the search casts a cloud on this "administrative search." Air Marshal Barber got involved with agents on the day in question when his supervisor asked him to meet and help the agents who were at the airport to conduct surveillance [Tr. at 244-46]. In the end, Air Marshal Barber was the one who conducted the search. While he had been involved in searches in the downstairs screening room of the airport, this was the first time he conducted a search at the oversized baggage counter [Tr. at 252-53, 293]. Furthermore, this was the first time, in his approximately ten years on the job, that TSA Supervisor Wurzbach had seen an Air Marshal get involved in the screening process at this stage [Tr. at 229-30].

Air Marshal Barber even admitted that he was unfamiliar with proper protocol--i.e., he was not sure if TSA screeners properly searched Muhammad's luggage [Tr. at 285, 289-90]. Air Marshal Barber was even unsure of the propriety of the physical search of Muhammad's bag that he performed, as shown by the fact that he spoke with a supervisor after the search to see if what he had done was proper [Tr. at 263-64, 290]. Accordingly, based on his overall involvement in this search, it appears this was not just a routine administrative search.

4. Other Indicia that True Purpose Was to Investigate

Lastly, while some statements made during the suppression hearing taken alone may not conclusively show this was not an administrative search, when considered in combination with other testimony, such statements undermine the Government's argument that a valid administrative search occurred. For example, TSA Supervisor Wurzbach said that when he arrived upon the scene

23

before the search at issue occurred "[t]he gentlemen that were below with [him] had taken charge" [Tr. at 219]. The men who had been below with TSA Supervisor Wurzbach, waiting for Muhammad's bag, were an ATF Agent and an Air Marshal [Tr. at 216]. Similarly, TSA Security Manager Babtiste explained that TSA Supervisor Wurzbach told her that the ATF Agents wanted him to open the bag so they could "count how many guns were present" [Tr. at 345]. Thus, these statements highlight that safety concerns were not the impetus, or reason, for the search.

Accordingly, based on the totality of the circumstances the Court concludes that the physical search of Muhammad's bag was not a valid administrative search. As such, the Court finds that Muhammad's motion to suppress all evidence related to this search [Doc. 26] should be granted. Having made such a determination, Muhammad's remaining objections are moot and need not be addressed.

### B. *Government's Objections*

#### 1. The Administrative Search of Muhammad's Luggage Did Not Exceed its Scope

The Government objects to Judge Walker's conclusion that the administrative search of Muhammad's luggage exceeded its scope, and her resulting recommendation that the photographs and the make, model, and serial numbers of the firearms should be suppressed [Doc. 66 at 3]. Having already determined that there was not a valid administrative search, the Court overrules the Government's objection.

### 2. Use of Evidence of Guns in Muhammad's Luggage against Ross

The Government's remaining objection to the R&R is that Ross has no standing to challenge the search of Muhammad's luggage, and thus the Government should be able to use the evidence obtained from that search against Ross. As discussed above, Ross pleaded guilty, and thus this objection is moot.

### IV. Conclusion

For the reasons set forth above, the Government's objections [Doc. 66] are OVERRULED, Defendant Muhammad's objections [Doc. 67] are GRANTED IN PART and DISMISSED AS MOOT IN PART, and the R&R [Doc. 61] is ADOPTED IN PART and REJECTED IN PART. Muhammad's motion to suppress all evidence and testimony from the December 23, 2010 search [Doc. 26] is GRANTED. However, Muhammad's motion to suppress the search of the Jeep Compass [Doc. 25] is DENIED, and his subsequent motion to suppress the results of the search of the Jeep Compass [Doc. 63] is DISMISSED AS MOOT. Lastly, Defendant Ross' motion to sever parties [Doc. 31] is DISMISSED AS MOOT.

SO ORDERED this 14 day of January, 2013.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

25